IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**ROBIN ROEBUCK,**
*Plaintiff/Appellant,*

*v.*

**MAYO CLINIC, ET AL.,**
*Defendants/Appellees.*

---

No. CV-23-0262-PR
Filed September 12, 2025

---

Appeal from the Superior Court in Maricopa County
The Honorable Rodrick J. Coffey, Judge
No. CV2021-090429
**REVERSED AND REMANDED**

---

Opinion of the Court of Appeals, Division One
256 Ariz. 161 (App. 2023)
**VACATED IN PART**

---

COUNSEL:

Robert M. Gregory (argued), Law Office of Robert M. Gregory, P.C., Gilbert, Attorney for Robin Roebuck

Rita J. Bustos (argued), Jones, Skelton & Hochuli, P.L.C., Phoenix; Vincent J. Montell, Quintairos, Prieto, Wood & Boyer, P.A., Scottsdale, Attorneys for Mayo Clinic, Mayo Clinic Arizona, Mayo Clinic Hospital, Nicole Secrest and Robert Scott

Joshua D. Bendor, Hayleigh S. Crawford (argued), Office of the Attorney General, Phoenix, Attorneys for the State of Arizona

David L. Abney (argued), Ahwatukee Legal Office, P.C., Phoenix, Attorneys for Amici Curiae Arizona Association for Justice, Arizona Trial Lawyers Association

Eileen Dennis GilBride, Jones, Skelton & Hochuli P.L.C., Phoenix, Attorneys for Amici Curiae American Medical Association, Arizona Medical Association, Phoenix Children's Hospital, HonorHealth, and Mutual Insurance Company of Arizona

D. Andrew Gaona, Austin C. Yost, Coppersmith Brockelman PLC, Phoenix, Attorneys for Amicus Curiae Arizona Hospital and Healthcare Association

Brett W. Johnson, Tracy A. Olson, Claudia E. Stedman, Snell & Wilmer L.L.P., Phoenix, Attorneys for Amicus Curiae Health System Alliance of Arizona

Michael G. Bailey, Arizona Chamber of Commerce, Phoenix, Attorneys for Amicus Curiae Arizona Chamber of Commerce and Industry

———————

JUSTICE BEENE authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ and JUSTICE MONTGOMERY joined.* JUSTICE BOLICK dissented in part, dissented from the judgment, and concurred in part with which JUSTICE MONTGOMERY joined.

———————

JUSTICE BEENE, Opinion of the Court:

¶1　　　This case requires us to determine whether A.R.S. § 12-516(A) violates the Arizona Constitution's anti-abrogation clause by barring claims for ordinary negligence but allowing claims for wilful misconduct or gross negligence against health care providers delivering pandemic-related medical treatment. Because § 12-516(A) eliminates a patient's right to

———————

* Justice Kathyrn H. King has recused herself from this case. Because Justice Robert M. Brutinel retired before oral argument and Justice Maria Elena Cruz had not yet been appointed to fill the vacancy, only five justices participated in this decision.

recover damages for ordinary negligence, we hold that it violates the Arizona Constitution's anti-abrogation clause.

## BACKGROUND

¶2　　　　In April 2020, Robin Roebuck was hospitalized for COVID-19 at the Mayo Clinic in Arizona. Because Roebuck had previously received a heart transplant, he was placed under the care of the Mayo Clinic's congestive heart failure team. During his hospitalization, a doctor ordered an arterial blood gas ("ABG") test as part of Roebuck's treatment for COVID-19. Roebuck developed complications from the ABG test and underwent surgery that resulted in significant scarring and diminished use of his right arm and hand.

¶3　　　　In January 2021, Roebuck filed a medical negligence suit against the Mayo Clinic, Mayo Clinic Arizona, Nicole Secrest, N.P., and Robert Scott, M.D. (collectively, "Mayo Clinic"). In his complaint, Roebuck alleged that the ABG test was negligently performed, but he did not allege that Mayo Clinic's conduct was grossly negligent. Mayo Clinic moved to dismiss, arguing that § 12-516 and other laws provide them with immunity for negligence arising out of their treatment of COVID-19. The superior court denied the motion because Roebuck adequately alleged that the ABG test was part of his heart treatment rather than his COVID-19 treatment.

¶4　　　　After conducting discovery regarding the purpose of the ABG test, Mayo Clinic moved for summary judgment. Finding that the ABG test was administered as part of Roebuck's COVID-19 treatment, the superior court concluded that § 12-516 was applicable and thus that Mayo Clinic was immune from Roebuck's ordinary negligence claim. In reaching this conclusion, the court explained that § 12-516 does not abrogate Roebuck's right of action, but instead merely imposes a higher evidentiary standard that requires Roebuck to prove by clear and convincing evidence that Mayo Clinic acted with wilful misconduct or gross negligence. Accordingly, the court entered summary judgment in favor of Mayo Clinic.

¶5　　　　The court of appeals reversed, concluding that "§ 12-516's prohibition on the assertion of ordinary negligence claims in providing COVID-related medical treatment constitutes an abrogation of a common law right of action in violation of [a]rticle 18, [s]ection 6." *Roebuck v. Mayo Clinic*, 256 Ariz. 161, 168 ¶ 27 (App. 2023).

¶6          We granted review because whether § 12-516 violates the anti-abrogation clause of the Arizona Constitution is an issue of statewide importance and likely to recur.  We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

¶7          "We review de novo a grant of summary judgment, 'viewing the evidence in the light most favorable to the party against whom summary judgment was entered.'"  *S. Ariz. Home Builders Ass'n v. Town of Marana*, 254 Ariz. 281, 284 ¶ 16 (2023) (quoting *Dabush v. Seacret Direct LLC*, 250 Ariz. 264, 267 ¶ 10 (2021)).  Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Ariz. R. Civ. P. 56(a).  We interpret constitutional provisions and statutes de novo. *State v. Anderson*, 257 Ariz. 226, 230 ¶ 13 (2024).

**I.**

¶8          Section 12-516(A) provides that during a state of emergency for a public health pandemic, a health professional or health care institution that is "providing health care services in support of" that emergency "is not liable for damages in any civil action for an injury or death" allegedly caused by the health care provider unless the plaintiff proves "by clear and convincing evidence" that the health care provider acted with "wilful misconduct or gross negligence."  Mayo Clinic argues that the court of appeals erred in concluding that § 12-516 violates the anti-abrogation clause in article 18, section 6 of the Arizona Constitution.

¶9          The anti-abrogation clause provides that "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation . . . ."  Ariz. Const. art. 18, § 6.  We have previously explained that "article 18, [section] 6 is an 'open court' guarantee intended to constitutionalize the right to obtain access to courts."  *Cronin v. Sheldon*, 195 Ariz. 531, 538 ¶ 35 (1999) (citation modified).

¶10          To determine whether a statute violates the anti-abrogation clause, this Court performs a two-part analysis.  *Duncan v. Scottsdale Med.*

4

*Imaging, Ltd.*, 205 Ariz. 306, 313 ¶ 28 (2003). The first inquiry is whether the right of action at issue falls within the protection of article 18, section 6. *Id.* If not, the inquiry ends. If so, the second inquiry is whether the statute abrogates or merely regulates that right of action. *Id.* ¶ 29.

**A.**

**¶11** We start by determining whether article 18, section 6 protects the right of action at issue here. In *Torres v. JAI Dining Servs. (Phoenix), Inc.*, 256 Ariz. 212, 218 ¶ 18 (2023), we "reaffirmed that the anti-abrogation clause only applies to rights of action that existed at common law in 1912 or that are based in such rights." While "[t]he clause generally protects from abrogation a wide swath of actions for which recovery was possible in 1912, such as negligence actions, intentional torts, and product liability claims," *id.* at 217 ¶ 13, we clarified that when determining whether a right of action was a cognizable right at the time of statehood, "courts should consider whether a plaintiff alleging the *same harm* could have recovered damages against the *same type of defendant* at statehood," *id.* at 218 ¶ 16 (emphasis in original). Accordingly, here we must consider whether a plaintiff alleging a personal injury could have recovered damages against a health care provider at statehood.

**¶12** We recently reiterated that the anti-abrogation clause "prohibits the 'abrogation of all common law actions for negligence,' *including medical malpractice*." *Francisco v. Affiliated Urologists Ltd.*, 258 Ariz. 95, 104 ¶ 39 (2024) (emphasis added) (quoting *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 388 ¶ 34 (2013)). This holding is consistent with our longstanding jurisprudence, which since statehood has allowed a patient to recover damages against a health care provider for injuries caused by that health care provider's negligence. *See Seisinger v. Siebel*, 220 Ariz. 85, 94 ¶¶ 32–33 (2009); *Rice v. Tissaw*, 57 Ariz. 230, 237–38 (1941); *Butler v. Rule*, 29 Ariz. 405, 407 (1926); *McCarthy v. Pamsetgaff, Inc.*, 20 Ariz. 460, 461–62 (1919); *Kain v. Ariz. Copper Co.*, 14 Ariz. 566, 567 (1913). The parties do not dispute that the first part of this analysis is met.

**B.**

**¶13** We turn next to the second part of the analysis. Because the anti-abrogation clause precludes abrogation but not regulation, the second inquiry requires us to determine whether § 12-516(A) abrogates the right of

action for negligence or merely regulates it.  *See Duncan*, 205 Ariz. at 313 ¶ 29.  To distinguish between regulation and abrogation, we apply the "reasonable election" test.  *Id.*  Under this test, "the [L]egislature may regulate a right of action protected by article 18, section 6, but it must 'leave a claimant reasonable alternatives or choices which will enable him or her to bring the action.'"  *Id.* ¶ 30 (citation modified) (quoting *Barrio v. San Manuel Div. Hosp. for Magma Copper Co.*, 143 Ariz. 101, 106 (1984)).  The Legislature may not "under the guise of 'regulation,' so affect the fundamental right to sue for damages as to effectively deprive the claimant of the ability to bring the action."  *Id.* (quoting *Barrio*, 143 Ariz. at 106).  A right of action is considered abrogated if no reasonable election remains, resulting in the right of action being "completely abolished."  *Barrio*, 143 Ariz. at 106 (quoting *Ruth v. Indus. Comm'n*, 107 Ariz. 572, 575 (1971)).

**¶14**　　　　Section 12-516(A) bars ordinary negligence claims but allows claims for gross negligence, so the question here is whether gross negligence is a reasonable alternative to ordinary negligence.  The court of appeals concluded that ordinary negligence and gross negligence are "distinct theories of liability," and thus "the availability of relief for gross negligence is not a reasonable alternative to a claim for ordinary negligence."  *Roebuck*, 256 Ariz. at 168 ¶ 24.  Mayo Clinic and supporting amici argue that the court of appeals erred in concluding that ordinary negligence and gross negligence are separate and distinct torts.  Instead, they assert that ordinary negligence and gross negligence are not separate rights of action, but rather points along the continuum of the broad right of action for negligence.

**¶15**　　　　While we agree with the court of appeals that gross negligence is not a reasonable alternative to ordinary negligence, resolving this inquiry does not turn on the question of whether ordinary negligence and gross negligence are distinct "torts" or "theories of liability" or "causes of action."  Focusing on that question loses sight of the proper inquiry.  Indeed, gross negligence and ordinary negligence may very well be classified as the same tort.  *See DeElena v. S. Pac. Co.*, 121 Ariz. 563, 566 (1979) ("Appellant argues that [gross negligence] is a tort wholly separate from negligence.  But it is settled that [gross negligence] is aggravated negligence."); *Williams v. Thude*, 188 Ariz. 257, 259 (1997) (noting that gross negligence is an aggravated form of negligence); *see also Garibay v. Johnson ex rel. Cnty. of Pima*, 259 Ariz. 248, 258 ¶ 38 (2025) (acknowledging that "defining 'negligence' and 'gross negligence' 'is, at best, inexact'" (quoting

*Weatherford ex rel. Michael L. v. State*, 206 Ariz. 529, 535 ¶ 20 n.4 (2003))). But this classification has no impact on whether gross negligence is a reasonable alternative to ordinary negligence.

**¶16** As we recently emphasized in *Torres*, the language of the anti-abrogation clause protects rights of action, not causes of action. *Torres*, 256 Ariz. at 218 ¶ 16. A right of action is "merely the right to pursue a remedy." *Id.* (quoting *Morgan v. Hays*, 102 Ariz. 150, 159 (1967) (Struckmeyer, J., dissenting)). Identifying the right of action at issue "hinges on the nature of the injury and the defendant." *Id.* at 219 ¶ 25. The dissent asserts that classifying ordinary negligence and gross negligence as the same tort ends the inquiry because "the right of action for negligence continues." *Infra* ¶ 55. However, we have explicitly rejected framing the right of action in such broad terms. In *Torres*, we explained that although dram-shop actions may be classified as negligence actions, the right of action was not "simple negligence," but rather the ability to bring a suit against a dram shop for injuries caused by an overserved patron. *See Torres*, 256 Ariz. at 218 ¶ 16, 219 ¶ 25, 220 ¶ 27. Likewise, the right of action at issue here is not, as the dissent suggests, the broad umbrella of "negligence." Rather, as we identified in step one of the anti-abrogation analysis, *supra* ¶ 12, the right of action at issue here is the ability to bring a suit against a health care provider for injuries caused by that health care provider's negligence. Thus, the proper inquiry here is whether § 12-516 completely abolishes a patient's ability to bring a suit against a health care provider for injuries caused by that health care provider's negligence, or if gross negligence is a reasonable alternative that would still allow those patients to bring an action. To answer this question, we begin by identifying how gross negligence differs from ordinary negligence.

**¶17** "In medical malpractice actions, as in all negligence actions, the plaintiff must prove the existence of a duty, a breach of that duty, causation, and damages." *Seisinger*, 220 Ariz. at 94 ¶ 32; *see Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 563–64 ¶ 7 (2018) (laying out the common law elements of negligence). As set forth in A.R.S. § 12-563, in a medical malpractice action against a health care provider, a plaintiff must prove that the provider failed to follow the standard of care—defined as "that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances"—and that such failure proximately caused the injury.

¶18　　　Gross negligence, however, requires an additional showing that the defendant acted with reckless indifference.  *See Womack v. Preach*, 63 Ariz. 390, 396 (1945); *Scott v. Scott*, 75 Ariz. 116, 122 (1953); *Noriega v. Town of Miami*, 243 Ariz. 320, 326 ¶ 23 (App. 2017); *DeElena*, 121 Ariz. at 566 (explaining that gross negligence "involves the creation of an unreasonable risk of bodily harm to another (simple negligence) together with a high degree of probability that substantial harm will result (wantonness)" (quoting *Bryan v. S. Pac. Co.*, 79 Ariz. 253, 256 (1955))); *Nichols v. Baker*, 101 Ariz. 151, 153 (1966) ("Wantonness implies a reckless indifference to the results of an act."); Restatement (Second) of Torts § 501 (Am. L. Inst. 1965).  "A person is recklessly indifferent if he or she knows, or a reasonable person in his or her position ought to know: (1) that his action or inaction creates an unreasonable risk of harm; and (2) the risk is so great that it is highly probable that harm will result." *Williams v. Thude*, 180 Ariz. 531, 537 (App. 1994), *aff'd*, 188 Ariz. 257 (1997); *Armenta v. City of Casa Grande*, 205 Ariz. 367, 372–73 ¶ 20 (App. 2003); *Womack*, 63 Ariz. at 398; *see also* Restatement § 500.  Thus, as we recently explained, "[a] party is grossly negligent if they know, or have reason to know, facts that would lead a reasonable person to recognize their conduct created an unreasonable risk of bodily harm and involved a high probability of substantial harm." *Garibay*, 259 Ariz. at 258 ¶ 38; *Nichols*, 101 Ariz. at 153; *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 595 (App. 1991).

¶19　　　In sum, gross negligence adds a quasi-intent element by requiring a showing that the defendant acted with reckless indifference.  While ordinary negligence "consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions," gross negligence "requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Williams v. Wise*, 106 Ariz. 335, 341 (1970) (quoting Restatement § 500, cmt. g); *see Scott*, 75 Ariz. at 122 ("[Gross] negligence is highly potent, and when it is present it fairly proclaims itself in no uncertain terms.  It is 'in the air', so to speak.  It is flagrant and evinces a lawless and destructive spirit.").

¶20　　　We turn now to whether gross negligence is a reasonable alternative to ordinary negligence in light of this quasi-intent element.  We have previously explained that "a regulation that limits the theories of liability under which a plaintiff may sue is nonetheless an abrogation when

the 'alternative' theory of recovery protects different interests." *Duncan*, 205 Ariz. at 313 ¶ 31; *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 343 (1993), *disapproved of on other grounds by Torres*, 256 Ariz. 212. In *Hazine*, we determined that strict products liability actions protect different interests than negligence actions and thus "a right to sue in negligence . . . is not a reasonable alternative to a products liability action." *Hazine*, 176 Ariz. at 343; *see Torres*, 256 Ariz. at 218 ¶ 17 (acknowledging that the outcome of *Hazine* was correct). We relied on *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 64 (Wyo. 1989), which explained that negligence actions focus on "the conduct" of the defendant while strict products liability actions focus on "the product itself," and strict products liability applies when "traditional theories of negligence are inadequate or where it is practicably impossible to prove negligence." *See also* 65 C.J.S. *Negligence* § 14 (2025) ("[W]here negligence claims focus is on the conduct of the actor, whereas in products liability cases, the focus is on the condition of the product.").

¶21　　　　As between ordinary negligence and gross negligence, ordinary negligence focuses solely on the defendant's conduct, while the quasi-intent element of gross negligence additionally considers the defendant's mental state. In *Duncan*, we determined that negligence and intentional torts protect different interests. *See Duncan*, 205 Ariz. at 314 ¶¶ 32, 34. We noted that the elements of negligence "have no application in the field of intentional torts," and that requiring a battery claimant to prove the elements of negligence "dramatically transforms the nature of the battery claim." *Id.* ¶ 33. Likewise, the mental state element of intentional torts has no application in the field of negligence. *See Ryan v. Napier*, 245 Ariz. 54, 59 ¶ 17 (2018) ("A negligence claim focuses on the defendant's conduct; intent is immaterial."); Dan B. Dobbs et al., *The Law of Torts* § 31 (2d ed. 2011) ("[N]egligence does not require a state of mind at all but focuses instead on outward conduct."); *id.* § 126 ("A bad state of mind is neither necessary nor sufficient to show negligence; conduct is everything." (internal footnote omitted)); 65 C.J.S. *Negligence* § 16 (2025) ("The words 'negligence' and 'intentional' are contradictory and mutually exclusive." (internal footnote omitted)). Though gross negligence falls short of intentional wrongdoing, *Garibay*, 259 Ariz. at 258 ¶¶ 38–39, "it is a cousin to the intentional tort even while it is at home in the negligence family," Dan B. Dobbs et al., *The Law of Torts* § 32 (2d ed. 2011). While some cases of gross negligence may look only to a defendant's conduct, the focus is not the conduct in and of itself, but rather whether the conduct is of such a nature so as to evince the defendant's reckless indifference. *See id.* ("As the

risk [of harm to others] becomes greater it may tend to approach virtual certainty [that harm will occur] and thus become a species of intent.").

**¶22**        Not every instance of medical negligence will involve reckless indifference on the part of the health care provider. *See Kemp v. Pinal County*, 13 Ariz. App. 121, 124–25 (1970) ("A person can be very negligent and still not be guilty of gross negligence."); *Noriega*, 243 Ariz. at 329 ¶ 41 ("We recognize that proving gross negligence is no easy task." (quoting *Luchanski v. Congrove*, 193 Ariz. 176, 180 ¶ 19 (App. 1998))).  Indeed, as § 12-516 applies to health professionals or health care institutions—which involves extensive licensing and regulation—the expectation is that medical negligence involving reckless indifference would be rare under any circumstance.  Accordingly, there exists a substantial class of plaintiffs injured by a provider's ordinary negligence that cannot in good faith plead that the provider acted with reckless indifference.  Ordinary negligence protects the right of injured patients to recover when gross negligence is not present or when gross negligence is "practicably impossible to prove." *See McLaughlin*, 778 P.2d at 64.  The quasi-intent element of reckless indifference transforms the nature of a negligence claim such that negligence as known at common law would no longer exist. *See Duncan*, 205 Ariz. at 314 ¶ 33 & n.2.  We conclude that gross negligence is not a reasonable alternative to ordinary negligence, and therefore § 12-516(A) completely bars recovery for plaintiffs injured by ordinary negligence in relation to a pandemic.

**¶23**        The dissent is concerned that "little is left of the Legislature's police power to 'regulate' torts" after our decision today. *Infra* ¶ 56.  However, the Legislature remains free to enact statutes that may have the effect of making it more difficult for plaintiffs to prevail. *See Franklin v. Clemett*, 240 Ariz. 587, 594 ¶ 20 (App. 2016) ("A statute does not 'effectively' abrogate a claim, however, by making it more difficult for the claimant to obtain a recovery or even when, in the claimant's view, it may weaken the claimant's case."); *Barrio*, 143 Ariz. at 106 (noting that "reasonable regulation of the manner and time for bringing the action" is permissible).  The Legislature has done so in several instances without running afoul of the anti-abrogation clause. *See State Farm Ins. Co. v. Premier Mfg. Sys., Inc.*, 217 Ariz. 222, 229 ¶¶ 34–37 (2007) (explaining that a statute abolishing joint and several liability in strict products liability cases did not violate the anti-abrogation clause because "the claimant remains entirely free to bring his claim against all responsible parties"); *Baker*, 231 Ariz. at 388 ¶ 35

(concluding that "[a]lthough the statute might deny a plaintiff his expert of choice" in a medical malpractice action, the statute nonetheless was a regulation because he could still bring the action).

¶24　　　　Importantly, the Legislature may modify or clarify the standard of care. *St. George v. Plimpton*, 241 Ariz. 163, 166 ¶ 18 (App. 2016) ("The standard of care may be 'established by a legislative enactment.'" (quoting *Tellez v. Saban*, 188 Ariz. 165, 169 (App. 1996))); *see* Restatement § 285. For example, the Legislature codified the ordinary standard of care in medical malpractice cases in § 12-563(1). *See Nunez v. Prof. Transit Mgmt. of Tucson, Inc.*, 229 Ariz. 117, 121 ¶ 19 n.3 (2012); *Baker*, 231 Ariz. at 384 ¶ 12. Then in § 12-516(C), the Legislature essentially clarified that the standard of care in relation to the pandemic was to follow the "applicable published guidance relating to the public health pandemic." But a statute goes beyond merely making it more difficult for plaintiffs to prevail when the statute "creates insurmountable hurdles for large and foreseeable classes of victims." *Boswell v. Phx. Newspapers, Inc.*, 152 Ariz. 9, 18–19 (1986). At bottom, the Legislature may regulate what constitutes negligence—for example, by modifying or clarifying the standard of care—but the Legislature may not abolish a patient's right to bring an ordinary negligence action for injuries caused by a physician's negligence.

¶25　　　　We conclude that § 12-516(A) abolishes the right to bring ordinary negligence actions against health care providers that furnished medical treatment during a public health pandemic. The statute does more than simply make it more difficult for an ordinary negligence plaintiff to prevail under these circumstances. Rather, it "creates insurmountable hurdles" for an entire class of plaintiffs injured by ordinary negligence, making it impossible for that class of plaintiffs to prevail. Accordingly, we conclude that § 12-516(A) is an unconstitutional abrogation of a plaintiff's right to sue for ordinary negligence under article 18, section 6 of the Arizona Constitution.

## II.

### A.

¶26　　　　At oral argument before us, amicus Attorney General argued that when considering whether a statute enacted by the Legislature to address a public emergency violates the anti-abrogation clause, courts

11

should incorporate a balancing of governmental interests into the reasonable elections test. Specifically, the Attorney General asserts that if we determine § 12-516(A) abrogates a fundamental right, the statute is nonetheless subject to additional judicial scrutiny because other fundamental rights are not absolute but are instead subject to some level of judicial balancing. We disagree.

¶27 No Arizona court has applied judicial balancing to the anti-abrogation clause analysis, and we decline to do so today. The plain language of the anti-abrogation clause is unequivocal: "The right of action to recover damages for injuries *shall never* be abrogated." Ariz. Const. art. 18, § 6 (emphasis added). Our state Constitution expressly states that the government derives its power from the people, and the purpose of the government is "to protect and maintain individual rights." *Id.* art. 2, § 2. While other fundamental rights may be subject to a balancing of interests, few other constitutional provisions are couched in such absolute terms as article 18, section 6. The plain language of the anti-abrogation clause creates a categorical prohibition that leaves no room for judicial discretion. Once we determine that a statute abrogates a constitutionally protected right of action, the inquiry ends. *See id.* art. 2, § 32 ("The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise."); *State v. Osborne*, 14 Ariz. 185, 204 (1912) ("'Mandatory' is defined as a command, hence obligatory. That which we must implicitly follow and obey."); *State ex rel. Morrison v. Nabours*, 79 Ariz. 240, 243 (1955). It would be antithetical to the anti-abrogation clause to subject its protections to judicial discretion to determine whether abrogation is nonetheless permitted if reasonable or justified under the circumstances. "Our [C]onstitution has spoken, and it is our duty to listen." *Kenyon v. Hammer*, 142 Ariz. 69, 74 (1984) (quoting *Daugaard v. Baltic Coop. Bldg. Supply Ass'n*, 349 N.W.2d 419, 425 (S.D. 1984)).

¶28 The Attorney General additionally argues that construing the anti-abrogation clause to prevent the Legislature from temporarily limiting the liability of health care providers during a public pandemic would undermine its police powers under article 4, part 1, section 1 of the Arizona Constitution. Not so.

¶29 Undoubtedly, the Legislature has the authority to enact legislation during a declared state of emergency pursuant to its inherent police powers under article 4, part 1, section 1. *See State v. Harold*, 74 Ariz.

210, 216 (1952); *Torres*, 256 Ariz. at 217 ¶ 15.  But that legislation *shall never* abrogate a right of action protected by article 18, section 6.  Interpreting the anti-abrogation clause as an absolute prohibition does not, as the Attorney General argues, undermine the Legislature's police powers.  The Arizona Constitution, unlike the Federal Constitution, is not "a grant of power or enabling act to the Legislature, but rather is a limitation upon the powers of that body." *Earhart v. Frohmiller*, 65 Ariz. 221, 224 (1947).  As such, we look to our Constitution not "to determine whether the Legislature is authorized to do an act, but only to see if it is prohibited." *Id.* at 225 (citation omitted).  "The [L]egislature has plenary power to deal with any topic *unless otherwise restrained by the Constitution*." *Seisinger*, 220 Ariz. at 92 ¶ 26 (emphasis added).  The anti-abrogation clause is a constitutional restraint on the Legislature's power.  Furthermore, the Legislature has no shortage of constitutionally permissible means to protect health care providers during a time of emergency.  And as noted earlier, the Legislature can exercise this power by choosing to regulate a right of action so long as it leaves a plaintiff with "reasonable alternatives or choices" that will preserve the ability to bring the action. *Barrio*, 143 Ariz. at 106.

**B.**

¶30        We also reject the argument advanced by amicus Arizona Chamber of Commerce and Industry (the "Chamber") that § 12-516(A) constitutes a derivative grant of sovereign immunity to health care providers, such as Mayo Clinic, that provide medical services during a public health pandemic.  While derivative sovereign immunity has been recognized by federal case law, Arizona has not adopted this doctrine, and the case law relied on by the Chamber, which we address below, belies its application in this case.

¶31        In *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), the United States Supreme Court concluded that when a private company carries out its duties pursuant to its contract with the federal government, "*there is no liability on the part of the contractor*" who simply performed as the government directed. *Id.* at 20–21 (emphasis added).  In *Yearsley*, the Court extended governmental immunity "[w]here an *agent* or *officer of the Government*" was acting on its behalf. *Id.* at 21 (emphasis added).  Here, the contractual or agency components that are essential to establishing a derivative grant of immunity between the state government and Mayo Clinic do not exist.

¶32        Similarly, in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 157, 159–60 (2016), the United States Supreme Court considered whether an individual's status as a federal contractor rendered him immune from suit for violating federal law.   Unremarkably, the Court reiterated that "[g]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Id.* at 166 (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)).   Again, the necessary contractual relationship between the individual or entity seeking immunity and the government that is needed for the extension of immunity is absent in this case.

¶33        In *Patterson v. City of Danville*, 875 S.E.2d 65, 69 (Va. 2022), the Virginia Supreme Court examined the application of derivative sovereign immunity to a physician employed by the government who allegedly failed to provide appropriate medical care to an individual incarcerated in a government-owned detention center.   In extending derivative sovereign immunity to the physician, the *Patterson* court emphasized that the physician was an employee of an immune governmental entity and thereby a "servant" through which the government acts.   *Id.* at 70.   Once again, because the facts in *Patterson* are distinguishable from circumstances in this case, the Chamber's reliance on its holding is misplaced.

¶34        The Chamber asserts that extending derivative sovereign immunity is appropriate when a private party is acting on behalf of the state, but it offers no Arizona authority or any other controlling authority for its belief that a private party acting without a contractual or agency relationship with the government acquires the government's comprehensive immunity for performing government work.   For this reason, its claim regarding derivative sovereign immunity fails.

### III.

¶35        Having determined that § 12-516(A)'s provision referring to wilful misconduct and gross negligence is unconstitutional, we turn to whether the portion of § 12-516(A) raising the burden of proof to clear and convincing evidence is severable from the invalid portion.

¶36        Courts generally give effect to severability clauses in statutes when possible.   *Selective Life Ins. Co. v. Equitable Life Assurance Soc'y*, 101

Ariz. 594, 599 (1967). When considering the severability of legislative acts, we uphold the constitutional portion of the statute "where the valid and invalid parts are so separate and distinct that it is clear" that the constitutional portion may stand. *Fann v. State*, 251 Ariz. 425, 436 ¶ 37 (2021) (citing *Millett v. Frohmiller*, 66 Ariz. 339, 342–43 (1948)). If, however, we find that "the valid and invalid portions are . . . so intimately connected as to raise the presumption the [L]egislature would not have enacted one without the other, and the invalid portion was . . . the inducement of the act," the entire statute will be invalidated. *Selective Life Ins. Co.*, 101 Ariz. at 599. "To be capable of separate enforcement, the valid portion of an act must be independent of the invalid portion and must form a complete act within itself." *Millett*, 66 Ariz. at 343 (quoting 2 Sutherland, *Statutory Construction* § 2404 (3d ed. Horack 1943)). Courts consider whether "the [L]egislature would have passed the statute had it been presented with the invalid features removed." *Id.* (quoting 2 Sutherland, *Statutory Construction* § 2404 (3d ed. Horack 1943)).

¶37        The Legislature may limit a plaintiff's right of action by regulating matters such as how causes of action must be brought, the relevant standards of pleading, and other procedural and evidentiary matters. *See Duncan*, 205 Ariz. at 313 ¶ 30; *Francisco*, 258 Ariz. at 104 ¶ 40 (stating that the Legislature may create a statutory framework that imposes "a stricter standard of pleading and setting deadlines for the early involvement of the plaintiff's expert witness" (quoting *Gorney v. Meaney*, 214 Ariz. 226, 229 ¶ 8 (App. 2007))). This Court has previously explained that "[i]t is one thing to hold that the right to bring a cause of action is guaranteed in the [C]onstitution, free from legislative control, but entirely different to hold that the [C]onstitution also requires that we continue to follow the same rules of pleading, procedure and evidence that existed in 1912." *Kenyon*, 142 Ariz. at 83 (internal citation omitted). As part of this power to regulate causes of action, the Legislature may establish or heighten burdens of proof. *See, e.g.*, *Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 336 ¶ 21 (2009) ("Because the [L]egislature is empowered to set burdens of proof as a matter of substantive law, a valid statute specifying the burden of proof prevails over common law or court rules adopting a different standard."); *Seisinger*, 220 Ariz. at 93 ¶ 30.

¶38        We conclude that the portion of § 12-516(A) raising the burden of proof to clear and convincing evidence is constitutional and severable from the invalid portion requiring proof of wilful misconduct or

gross negligence. The apparent purpose of § 12-516 is to mitigate the liability risk for health care providers responding to the unusually challenging emergency circumstances during a pandemic. *See Guerrero v. Copper Queen Hosp.*, 112 Ariz. 104, 106 (1975) (noting that "[t]he apparent purpose" of A.R.S. § 32-1471, which requires gross negligence in claims against individuals gratuitously rendering emergency care, was "to relieve the burden of liability" on those individuals). To that end, both the gross negligence and clear and convincing evidence portions of the statute advance this purpose. Further, the Legislature has previously enacted statutes heightening the burden of proof to clear and convincing evidence in cases against health professionals providing emergency medical treatment without also requiring gross negligence. *See* A.R.S. § 12-572. Accordingly, we conclude that the Legislature would have enacted § 12-516(A) even if the invalid portion relating to wilful misconduct and gross negligence had been removed.

## CONCLUSION

¶**39** Although we agree with the court of appeals' holding, we vacate paragraphs 17–29 of the court of appeals' opinion to replace its reasoning with our own. We reverse the superior court's entry of summary judgment in favor of Mayo Clinic and remand to the superior court for further proceedings consistent with this Opinion.

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

BOLICK, J., dissenting in part, dissenting from the judgment, and concurring in part with which  MONTGOMERY, J., joins :

**¶40**　　　　I disagree with my colleagues that the anti-abrogation clause, Ariz. Const. art. 18, § 6, invalidates the statute that increases the standard for proving negligence in COVID 19-related cases, and therefore would rule in favor of Mayo.　However, I agree strongly with my colleagues that alternative arguments made by amici State and Arizona Chamber of Commerce—respectively, that the state's powers expand during an emergency and that hospitals should have been clothed by sovereign immunity in these circumstances—are profoundly wrong, and I therefore concur in Parts II and III of the opinion and add some additional points. My dissenting views are set forth in Part A and my concurring views (joined by Justice Montgomery) in Parts B and C below.

### A.

**¶41**　　　　As the majority aptly explains, *supra* Part I(B) ¶¶ 23–24, in our federalist republic, the police power—that is, the power to regulate public health, safety, and welfare—reposes in the states, except where the states delegated limited authority to the national government.　Thus, when we examine whether the national government possesses a police power, we look for an express grant of authority to that effect.　Whereas with the states, we look to see whether their organic police power is constrained by an express reservation of individual rights or a structural constraint on government power.　*See, e.g.*, *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535–36 (2012); *Johnson Utils., L.L.C. v. Ariz. Corp. Comm'n*, 249 Ariz. 215, 234 ¶ 95 (2020) (Bolick, J., concurring in part and dissenting in part).

**¶42**　　　　Unquestionably, the statute at issue here is an exercise of the state's police power.　The state's power to protect public health is broad and does not depend on an emergency.　*See, e.g.*, *Maricopa Cnty. Health Dep't v. Harmon*, 156 Ariz. 161, 167 (1987).

**¶43**　　　　COVID-19 presented public policy challenges that were nearly unprecedented, certainly in modern times.　The ubiquitous image of masks, ventilation intubation units, tents outside of hospitals, hospital ships, closed government schools, forced human distancing, closure of

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

businesses and churches, and the like will long endure in the public memory no matter how merciful the passage of time.  What public officials knew about the disease was far exceeded by what they didn't know.

¶44        The parties agree that the statute and executive order that preceded it were intended to encourage physicians to take the risk of treating COVID-19 patients without the benefit of full knowledge about the interaction of the virus with ordinary medical procedures.  Unlike the national government, which in some instances gave full immunity to those addressing the crisis, *see, e.g.*, 42 U.S.C. § 247d-6d (providing immunity from liability for claims related to use of medical countermeasures during a public health emergency); 42 U.S.C. §§ 300aa-1 to 300aa-34 (providing immunity from liability for claims caused by or arising from vaccine manufacturing and administration), Arizona chose not to extend immunity but simply to limit liability for treating physicians in certain circumstances.  There is no doubt this type of regulation would constitute a classic lawful exercise of the police power absent an express constitutional constraint.

¶45        Here, the majority concludes that the constitutional provision that prohibits this exercise of the police power is Arizona Constitution article 18, section 6, which provides in relevant part: "The right of action to recover damages for injuries shall never be abrogated . . . ."  I concede that under this Court's precedents this is a close question, but only because those precedents are unmoored from the limited intended scope of this provision.

¶46        As the majority observes, the Court has read this provision to constitute a prophylactic limitation on the Legislature's power to regulate torts.  But that is a matter of this Court's invention rather than commanded by the Constitution.  Superficially, the provision's words in isolation would imply such meaning.  But closer inspection demonstrates that the provision was written and intended to have a much narrower impact.

¶47        In *Torres v. JAI Dining Servs. (Phoenix), Inc.*, 256 Ariz. 212 (2023), the Court reined in an expansive interpretation of the anti-abrogation clause that would essentially freeze forever tort protections, even those manufactured by the judiciary, against legislative modification.  Specifically, the Court held that legislative modification of judicially decreed dram-shop liability rules was permissible because such actions

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

were "not based in a right of action recognized by our pre-statehood common law and [therefore] are outside the scope of the anti-abrogation clause." *Id.* at 220 ¶ 28.

¶48        In light of past opinions that established such parameters for the anti-abrogation clause—that is, that the clause prohibits abrogation of rights of action recognized at common law—I joined the opinion. However, I also wrote a concurring opinion explaining that the clause was not written or meant to have such broad effect, raising points that are relevant to the disposition of the matter today. *See id.* at 220–25 ¶¶ 30–52 (Bolick, J., concurring).

¶49        To start, the superficial reading of the provision's language that the Court has consistently applied is belied by its context. And as the Court has consistently admonished, constitutional and statutory provisions must *always* be read in context. *See Roundtree v. City of Page*, ___ Ariz. ___, ___, 573 P.3d 65, 69 ¶ 13 (2025) ("We interpret statutory and constitutional provisions not in isolation, but in context with other provisions covering the same subject matter, to ensure that the provisions' meaning is effectuated." (citing *In re Chalmers*, ___ Ariz. ___, ___, 571 P.3d 885, 889 ¶ 18 (2025))).

¶50        The Arizona Constitution is chock-full of express reservations of rights and structural limitations on the power of government. Clint Bolick, *Principles of State Constitutional Interpretation*, 53 Ariz. St. L.J. 771, 787–89 (2022). Most of the protections of individual rights are found in our extensive Declaration of Rights. *See* Ariz. Const. art. 2. Indeed, one of those express rights provides that the amount of damages for injuries may never be restricted. *Id.* art. 2, § 31. For that reason, had the Legislature here opted to cap damages instead of modifying liability, I would have had no problem voting to strike down such a provision.

¶51        The majority here and prior Court decisions treat the anti-abrogation clause as if it is a similarly broad protection of individual rights. Notably, however, the framers did not place it along with dozens of such rights in the Declaration of Rights, but rather in article 18, which covers "Labor." As I noted in *Torres*, "[i]f article 18, section 6 speaks to all circumstances and all causes of action, . . . it is a strange coupling with sections in the same article dealing with an eight-hour workday (section 1),

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

child labor (section 2), contractual immunity of employer from liability for negligence (section 3), employer's liability (section 7), and workmen's compensation (section 8)."[1]  *Torres*, 256 Ariz. at 223 ¶ 41 (Bolick, J., concurring).  Had the Court not subsequently magnified its meaning, *see* cases cited *supra* ¶¶ 9–12, one might almost think that Section 6 was meant to confer a *labor* right rather than a right for all tort plaintiffs.

¶52        It turns out that is exactly what the framers meant and wrote. The words themselves provide further basis.  The framers did not use "causes of action," or even "rights" of action.  Rather, they chose *the right of action*.  In the context of the labor article, that pertained to a *specific* right of action.  In a definitive law review article that traces both the legislative history and intent behind the anti-abrogation clause, University of Arizona Law Professor (and former dean) Roger C. Henderson established that the provision was exclusively aimed at preserving specific tort actions by employees against employers that were in jeopardy at the time.  Roger C. Henderson, *Tort Reform, Separation of Powers, and the Arizona Constitutional Convention of 1910*, 35 Ariz. L. Rev. 535 *passim* (1993).  As Professor Henderson concludes, "there does not appear on the basis of the evidence available today to be any real justification for holding that the guarantees under section 6 of article XVIII were ever intended for the 'benefit of all.'" *Id.* at 617.  To my knowledge, this Court has never engaged, much less rebutted, Prof. Henderson's scholarship.

¶53        Given that I am generally content to accept the Court's expansive reading of the anti-abrogation clause as a matter of stare decisis, *see Francisco v. Affiliated Urologists Ltd*, 258 Ariz. 95, 105–09 ¶¶ 44–61 (2024) (Bolick, J., concurring in part, dissenting in part), why am I going into such detail on this issue apart from my ongoing annoyance over judicial adventurism in the common law context?  *See* Clint Bolick, *Setting Boundaries: State Courts, Common Law, and Separation of Powers*, 57 Ariz. St. L.J. 422 (2025).  I do so to demonstrate again that the anti-abrogation clause is not intended to freeze torts in place for all time, and that the majority's

---

[1] Indeed, if article 18, section 6 protects negligence claims for all persons in all circumstances, it would render unnecessary a separate protection for employees against employers as provided in article 18, section 3.  We do not read constitutional provisions in a way that renders others superfluous. *See Burns v. Ariz. Pub. Serv. Co.*, 254 Ariz. 24, 30 ¶ 23 (2022).

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

broad interpretation of the term "right of action" is inconsistent with the provision's text and meaning.

¶54 Indeed, the majority's attempt to define this central term further churns already muddied waters. It construes the "right of action" that is protected against abrogation both narrowly and expansively. It acknowledges that ordinary negligence and gross negligence "may very well be classified as the same tort." *Supra* at Part I(B) ¶ 15 (citations omitted). "A right of action is considered abrogated if no reasonable election remains, resulting in the right of action being 'completely abolished.'" *Id.* ¶ 13 (citations omitted). "However, the Legislature remains free to enact statutes that may have the effect of making it more difficult for plaintiffs to prevail." *Id.* ¶ 23.

¶55 The statute would seem to satisfy these requirements. Ordinary negligence and gross negligence arise from the same tort: negligence. The right of action for negligence continues. The heightened standards make it more difficult, but not impossible, to prevail in a negligence action. But the majority drills down by insisting that, in reality, the cause of action cannot be modified in a way that makes it more difficult for some plaintiffs to prevail. "Not every instance of medical negligence will involve reckless indifference on the part of the healthcare provider." *Id.* ¶ 22. The majority focuses on this "quasi-intent element" as distinguishing the tort from common law so as to amount to abrogation. *Id.*

¶56 This is a broad expansion of article 18, section 6, from prohibiting abrogation of a right of action to prohibiting alteration of an *element* of a particular *cause of action*. For if the right of action is construed as the right of the same plaintiffs to sue the same defendants for damages for the same injury, then the right is not abrogated at all. *See Nunez v. Prof'l Transit Mgmt. of Tucson, Inc.*, 229 Ariz. 117, 122–23 ¶¶ 25–26 (2017) (holding that the anti-abrogation clause does not prohibit regulation of torts but protects access to the courts). But if the right of action is defined broadly to preserve the "same elements," then the tort is frozen, the legislative modification does amount to abrogation, and little is left of the Legislature's police power to "regulate" torts.

¶57 In my view, "right of action," even conceding that it is not limited to the specific right of action contemplated by the framers, is a term

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

of art.  At statehood, and today, it means "[t]he right to bring suit; a legal right to maintain an action, growing out of a given transaction or state of facts and based thereon." *Right of action*, Black's Law Dictionary (2d ed. 1910); *accord Right of action*, Black's Law Dictionary (12th ed. 2024) ("The right to bring a specific case to court.").  Raising the standards for proving negligence does not abrogate the right of action.  Abrogation means erasure. *Abrogate*, Black's Law Dictionary (2d ed. 1910) ("To annul, repeal, or destroy; to annul or repeal an order or rule issued by a subordinate authority; to repeal a former law by legislative act, or by usage.").  Anything short of abrogation is regulation; and regulation of torts is permissible, even under the Court's expansive application of the anti-abrogation clause.

¶**58**        Had the Legislature clothed doctors and hospitals with complete immunity, I would have joined my colleagues in finding it a violation of the anti-abrogation clause.  Instead, the Legislature chose a middle ground, raising standards for medical negligence during an emergency without abolishing the right of action.  I regret that judicially abrogating this policy tool may force hospitals, physicians, and other healthcare providers to make very difficult decisions in the next healthcare crisis, not necessarily to the benefit of people needing treatment.

¶**59**        For the foregoing reasons and with great respect to my colleagues, I dissent from Part I of the Court's decision and from the disposition.

**B.**

¶**60**        Given that the State's authority to pass § 12-516 fits comfortably within its broad, ordinary police powers, unconstrained by the anti-abrogation clause, it was unnecessary—and in light of the result, probably unwise—for the State to invoke sweeping emergency powers to defend such legislation.  I join my colleagues in rejecting that argument. Under the Arizona Constitution, such powers do not exist.

¶**61**        At oral argument, Mayo ceded its opening time to amicus State, which used it to argue that the anti-abrogation clause should be construed in light of the COVID-19 emergency.  The State argued that "emergency powers are inherent in government" and "[e]ven fundamental constitutional rights may be subject to limitation for a temporary period in

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

times of emergency."  I do not want to overstate its position, but the State clearly presented an aggrandized vision of police power that expands during emergencies while constitutional rights and constraints concomitantly contract.  I join my colleagues in disabusing that notion.

**¶62**          The State's position finds support in some U.S. Supreme Court precedents.  *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934)[2]; *Korematsu v. United States*, 323 U.S. 214 (1944), *overruled by Trump v. Hawaii*, 585 U.S. 667, 710 (2018).  More recently, the Supreme Court has rejected the argument that the government's powers to infringe constitutional rights expand during an emergency.  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area.  But even in a pandemic, the Constitution cannot be put away and forgotten."); *accord id.* at 21 (Gorsuch, J., concurring) ("Government is not free to disregard the First Amendment in times of crisis.").  Regardless, in my view, the State's position finds no support in the Arizona Constitution.

**¶63**          Presumably, the reason the State relies on "inherent" emergency powers is that no express provision in the Constitution supports that proposition.  Within its constitutional authority, the Legislature does possess express emergency powers in two discrete circumstances, neither of which is remotely applicable here.  First, article 4, part 1, section 1(3) authorizes the Legislature to accelerate the effective date of laws upon declaration of an emergency by two-thirds of the members.  Second, article 4, part 2, section 25 confers power upon the Legislature to take certain actions to "insure continuity of state and local governmental operations in periods of emergency resulting from disasters caused by enemy attack."  Even in these narrow circumstances, "the [L]egislature shall in all respects conform to the requirements of this constitution except to the extent that in the judgment of the [L]egislature so to do would be impracticable or would admit of undue delay."

---

[2] Even in *Blaisdell*, the Court admonished that "[w]hile emergency does not create power, emergency may furnish the occasion for the exercise of power."  290 U.S. at 426.

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

**¶64**        If the State possesses vast "inherent" emergency powers, these very limited emergency authorizations would be redundant and unnecessary.  The rule of construction that the listing of specific things implies the exclusion of others, *City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 211 ¶ 13 (2019) (applying canon); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012), applies here with special force when we are searching for an extraordinary grant of government power.  I find none.[3]

**¶65**        The same Constitution that omits any broad grant of emergency power explicitly and abundantly protects individual rights. When we interpret the Constitution, a statute, or a contract, we generally apply the plain language as commonly understood when it was adopted. *Matthews v. Indus. Comm'n of Ariz.*, 254 Ariz. 157, 163 ¶¶ 29–33 (2022).  But where the document we are interpreting contains an express statement of purpose, we are obligated to construe its provisions to effectuate that purpose.  *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 144 ¶ 25 (2024).

**¶66**        Helpfully, the framers of the Arizona Constitution provided exactly that.  In article 2, section 2, they declared that "governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights."  Given that the Constitution was adopted only seven years after *Jacobson*, which found no federal constitutional violation from a state's exercise of emergency powers during

---

[3] So too with the national Constitution.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 649–50 (1952) (Jackson, J., concurring) ("The appeal, however, that we declare the existence of inherent powers *ex necessitate* to meet an emergency asks us to do what many think would be wise, although it is something the forefathers omitted.  They knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation.  We may also suspect that they suspected that emergency powers would tend to kindle emergencies. Aside from suspension of the privilege of the writ of habeas corpus in time of rebellion or invasion, when the public safety may require it, they made no express provision for exercise of extraordinary authority because of a crisis.  I do not think we rightfully may so amend their work. . . ." (footnotes omitted)).

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

an epidemic, this provision appears as an emphatic rejection of the principles announced in that decision.

¶67 Among the many provisions of the Arizona Constitution that I wish were present in its national counterpart is article 2, section 32, which provides in simple declarative language that "[t]he provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." As judges who take an oath to the Arizona Constitution, we are not free to disregard or adulterate its guarantees. That emphatically includes the individual rights guaranteed by our Constitution that could be eviscerated by an invocation of emergency powers.

¶68 Similarly, the first section of our Declaration of Rights instructs that "[a] frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government." Ariz. Const. art. 2, § 1. That directive is deeply embedded in our constitutional heritage. As this Court recently observed, Arizona's enabling act required that our state constitution "shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence." *Beck v. Neville*, 256 Ariz. 415, 423 (2024) (citing A.R.S., Enab. Act, Sec. 20). The preamble of the Declaration of Independence, in turn, proclaimed the unalienable rights of life, liberty, and the pursuit of happiness, and declared "[t]hat to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed." The Declaration of Independence para. 2 (U.S. 1776). Which brings us full circle to the exact same purpose of government established in article 2, section 2 of the Arizona Constitution. Our constitution is manifestly inconsistent with an inchoate concept of government powers that expand in an emergency.

¶69 The State assures that we need not worry about a wholesale violation of individual rights during a declared emergency because such powers imply a "limiting principle," namely that "emergency powers terminate when there's no longer any necessity and there's no emergency." The most eloquent response to that argument of which I am aware was made by the great Justice Robert H. Jackson in his *Korematsu* dissent, voting to strike down an emergency military order requiring the internment of Japanese-Americans. The passage is lengthy but worth quoting in full:

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

> [A] judicial construction of the due process clause that will sustain this order is a far more subtle blow to liberty than the order itself. A military order, however unconstitutional, is not apt to last longer than the military emergency. . . . But once a judicial opinion rationalizes such an order to show that it conforms to the Constitution, . . . the Court for all time has validated the principle of racial discrimination in criminal procedure and of transplanting Americans. The principle then lies around like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need. Every repetition imbeds that principle more deeply in our law and thinking and expands it to new purposes.

323 U.S. at 245-46 (Jackson, J., dissenting).

¶70　　　Just as the U.S. Supreme Court eventually consigned *Korematsu* to its overdue demise, so too is it fitting for this Court to repudiate the notion of inherent emergency powers under the Arizona Constitution. The hallmark of a healthy constitutional republic is not only that it protects individual rights against the majority, but that it does so even (and perhaps especially) during proclaimed emergencies. *Ex parte Milligan*, 71 U.S. 2, 121 (1866) ("No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government."). That is the vital principle this Court vindicates today.

## C.

¶71　　　I also agree with my colleagues in rejecting the Arizona Chamber of Commerce's argument that the challenged statute confers derivative sovereign immunity on those it seeks to protect. I write only to emphasize that if this argument were to succeed, it would expose private entities to liability for acting under "color of state law" under 42 U.S.C. § 1983, as well as potentially making them state actors for purposes of constitutional actions against them. *See, e.g.*, *Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802 (2019).

ROBIN ROEBUCK v. MAYO CLINIC, ET AL.
Justice Bolick, Dissenting in part, Dissenting from the judgment, and
Concurring in part with which Justice Montgomery joins

¶72        The U.S. Constitution textually demarcates private from state action, and exposes only the latter to constitutional proscriptions. *See, e.g.*, *Civil Rights Cases*, 109 U.S. 3, 11 (1883) ("It is State action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the amendment."); *Halleck*, 587 U.S. at 804 ("The First Amendment constrains governmental actors and protects private actors."). That line may be eroding. *Compare Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (explaining that state action exists where government exerts "coercive power" or provides "significant encouragement" so that "the choice must in law be deemed to be that of the State"); and *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ("It is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." (citation omitted)), *with Murthy v. Missouri*, 603 U.S. 43, 76–81 (2024) (Alito, J., dissenting) (characterizing the government's campaign of pressure and threats against online platforms' exercise of editorial discretion as "jawboning" that transforms private moderation into state action); and *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024) (holding that the NRA's allegations that a regulator coerced banks and insurers to cut ties with the NRA because of its views stated a First Amendment claim)*; see also Moody v. NetChoice, LLC*, 603 U.S. 707, 794 (2024) (Alito, J., concurring in the judgment) (suggesting that whether platforms like YouTube and Facebook—"the 21st-century equivalent of the old 'public square'"—"should be viewed as common carriers" is an argument that "deserves serious treatment"); and *Halleck*, 587 U.S. at 828 (Sotomayor, J., dissenting) (arguing that public-access channel operators performed a quintessentially public function and should be treated as state actors). For a business association to attempt to invoke sovereign immunity for the momentary gain of limiting liability in personal injury cases, while thereby potentially exposing businesses to broad liability for constitutional and statutory violations that ordinarily apply only to the government, strikes me as shortsighted.  I agree with my colleagues that it fails as a matter of law.